UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

| | | |
|---|---|---|
| THULE, INC., Individually and on Behalf of All Others Similarly Situated, | ) ) ) | No. |
| | ) | <u>CLASS ACTION</u> |
| Plaintiff, | ) ) | |
| vs. | ) ) | |
| PACKAGING CORPORATION OF AMERICA, INTERNATIONAL PAPER, WEYERHAEUSER COMPANY, GEORGIA PACIFIC LLC, TEMPLE-INLAND INC. and SMURFIT-STONE CONTAINER CORPORATION, | ) ) ) ) ) ) ) | |
| Defendants. | ) ) ) | |
| | ) | <u>DEMAND FOR JURY TRIAL</u> |

CLASS ACTION COMPLAINT FOR VIOLATION OF §1 OF THE SHERMAN ACT

## NATURE OF THE ACTION

1.       Plaintiff Thule, Inc. ("Plaintiff" or "Thule"), a direct purchaser of Containerboard Products from one or more of the Defendants, brings this action on its own behalf and on behalf of the Class, as defined below, to recover damages and obtain injunctive relief for Defendants' violations of the federal antitrust laws with respect to fixing prices for containerboard.

2.       Containerboard is made up of two unconverted materials that are used to manufacture corrugated products: linerboard and corrugating medium.  The corrugating medium makes up the inner layer of the corrugated product and the linerboard is the thick, rigid paper that is used to form the external faces of the corrugated products.  The corrugating medium and the linerboard are glued together to form containerboard.  Containerboard is converted into heavy corrugated cardboard boxes and other types of packaging.  As used herein, "Containerboard Products" includes corrugated sheets and other corrugated products including boxes and other types of packaging.  From at least May 1, 2005 until the effects of the anticompetitive conduct cease ("Class Period"), Defendants produced Containerboard Products sold to Plaintiff and members of the Class.

3.       The Containerboard Products industry is highly susceptible to collusive behavior and anticompetitive conduct due to a small number of producers, significant barriers to entry in the market, inelastic product demand, the commodity-like nature of the products, and an inability of any single manufacturer to unilaterally control supply and price.  The consolidation of the containerboard industry over the last decade has further concentrated the industry and exacerbated the conditions that led to the anticompetitive conduct at issue in this Complaint.  Additionally, Defendants' membership and participation in trade organizations such as the Fibre Box Association ("FBA") and the American Forest & Paper Association ("AF&PA") facilitated the illegal price-fixing scheme described herein.  Moreover, the containerboard industry has a long history of anticompetitive conduct, stretching back decades.

- 1 -

4.      Beginning in at least 2005, Defendants coordinated reductions in containerboard production either through capacity cuts or by way of idling containerboard mills and machinery, despite increased or steady demand.  This in turn led to a decrease in the supply of Containerboard Products available in the market and an artificial shortage of Containerboard Products in the United States.  Defendants thereby were able to raise prices of Containerboard Products to supracompetitive levels.

5.      Steady price increases during the Class Period, including three in 2010 alone, have resulted in record price levels.  On May 28, 2010, after the second price hike in May 2010, a senior analyst predicted a third price increase because the "industry fundamentals remain strong" – demand was up and supply was tight.  After the third price increase, one industry article noted that price increases, along with the manufacturing capacity cuts, as well as the absence of cost drivers, "***call[] into question the integrity of our industry***" and "call into question the pricing activities of the major companies."  The article also noted the similarity of the present situation to "the years 1994-1995, six price increases in the span of 18 months pushed containerboard to a then-unheard-of peak" which resulted in allegations of collusion, government investigations and a consent decree and over $200 million paid in settlements.  Another article reporting on the third price increase in 2010 noted that the "mills have gone too far and too fast."  The article further stated the increase was "problematic."

6.      Defendants' anticompetitive conduct cannot be explained away as independent parallel behavior.  In fact, Defendants confirm that market demand for Containerboard Products remained stable or was expected to increase during the period of coordinated production capacity restriction.  Similarly, no significant lasting changes in production costs account for Defendants' repeated price increases.  Indeed, during the Class Period, price increases outpaced cost increases by over 50%.  Although basic economics holds that manufacturers in a competitive market faced with similar demand conditions (as evidenced here) would be expected to increase production to satisfy

- 2 -

market demand and gain market share, each Defendant refrained and instead opted to reduce production capacity. The result of this scheme is supracompetitive prices paid by Plaintiff and the Class. As a result of Defendants' anticompetitive conduct, Plaintiff and members of the Class paid supracompetitive prices for Containerboard Products sold in the United States during the Class Period.

## JURISDICTION AND VENUE

7.      Plaintiff brings this action under Section 4 of the Clayton Act, 15 U.S.C. §15, to recover treble damages and costs of suit, including reasonable attorneys' fees, against Defendants for the injuries sustained by Plaintiff and the members of the Class by reason of the violation of Section 1 of the Sherman Act, 15 U.S.C. §1.

8.      This action is also instituted under Section 16 of the Clayton Act, 15 U.S.C. §26, to secure injunctive relief against Defendants to prevent them from further violations of Section 1 of the Sherman Act, as alleged below.

9.      This Court has jurisdiction under 28 U.S.C. §§1331 and 1337, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§15(a) and 26.

10.     Venue is proper in this District pursuant to Sections 4, 12 and 16 of the Clayton Act, 15 U.S.C. §§15, 22 and 26, and 28 U.S.C. §1391(b), (c) and (d), because, during the Class Period, Defendants resided, transacted business, were found, or had agents in this District, and a substantial portion of the affected interstate trade and commerce described herein has been carried out in this District.

11.     This Court has personal jurisdiction over each Defendant because, *inter alia*, each Defendant: (a) transacted business throughout the United States, including in this District; (b) participated in the production and sale of Containerboard Products throughout the United States, including in this District; (c) has substantial contacts with the United States, including in this

District; and/or (d) was engaged in an illegal scheme and price-fixing conspiracy that was directed at and had the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States, including in this District. Further jurisdictional contacts are alleged below.

## PARTIES

### A. Plaintiff

12.     Thule, Inc. ("Thule") is the world's leading manufacturer of sport racks. Thule's product line features multi-purpose roof racks, roof top boxes, rear mount racks and accessories for outdoor equipment including bikes, skis, snowboards, kayaks, canoes and surfboards. Thule is a wholly owned subsidiary of the Thule Group. Headquartered in Seymour, Connecticut, Thule directly purchased Containerboard Products from one or more of the Defendants during the proposed Class Period. Thule is a large purchaser of Containerboard Products, purchasing approximately $1.5 million worth on an annual basis.

### B. Defendants

13.     Packaging Corporation of America ("PCA") is a Delaware corporation with its principal place of business in Lake Forest, Illinois. PCA is the fifth largest producer of containerboard with 2.258 million tons produced in 2009 and a 6.5% market share. PCA runs four containerboard mills and 68 corrugated products plants where they manufacture linerboard, corrugating medium and Containerboard Products. According to PCA's 2009 Form 10-K, PCA runs corrugated manufacturing operations in 26 different states in the United States. In 2009, PCA shipped about 28.9 billion square feet of corrugated products, which produced net sales of $2.15 billion. During the Class Period, PCA and/or its predecessors, wholly owned or controlled subsidiaries or affiliates sold Containerboard Products in interstate commerce directly to purchasers in the United States.

- 4 -

14.     International Paper ("International Paper") is a New York corporation with its principal place of business in Memphis, Tennessee.  In July 2005, International Paper consolidated its operations to focus on three platform businesses: (1) Uncoated Papers; (2) Industrial Packaging; and (3) Consumer Packaging.  International Paper produces Containerboard Products through its Industrial Packaging Unit.  This segment makes up 38% of International Paper's net sales and 32% of its operating profits.   On August 4, 2008, International Paper purchased Defendant Weyerhaeuser's containerboard packaging and recycling businesses for $6 billion in cash, making International Paper the largest containerboard producer in North America with a 29% market share. International Paper produces approximately 11 million tons of containerboard annually.  In 2009, net sales in International Paper's containerboard segment for North America reached $7.6 billion and its operating profit nearly doubled reaching $761 million.  During the Class Period, International Paper and/or its predecessors, wholly owned or controlled subsidiaries or affiliates sold Containerboard Products in interstate commerce directly to purchasers in the United States.

15.     Weyerhaeuser Company ("Weyerhaeuser") is a Washington corporation with its principal place of business in Federal Way, Washington.  Weyerhaeuser's containerboard, packaging and recycling sector accounted for $5.168 billion in net sales in 2007 and $3.169 billion in 2008.  On August 4, 2008, Weyerhaeuser's containerboard, packaging and recycling business was sold to Defendant International Paper for $6 billion.  During the Class Period, Weyerhaeuser and/or its predecessors, wholly owned or controlled subsidiaries or affiliates sold Containerboard Products in interstate commerce directly to purchasers in the United States.

16.     Georgia Pacific LLC ("Georgia Pacific") is a division of Koch Industries, Inc. ("Koch").  Its principal place of business is in Atlanta, Georgia.  In December 2005, Koch purchased Georgia Pacific for $21 billion.  Georgia Pacific runs five containerboard mills in the United States and is the fourth largest producer of containerboard in the United States with a 10% share of the

market. During the Class Period, Georgia Pacific and/or its predecessors, wholly owned or controlled subsidiaries or affiliates sold Containerboard Products in interstate commerce directly to purchasers in the United States.

17. Temple-Inland, Inc. ("Temple-Inland") is a Delaware corporation with its principal place of business in Austin, Texas. Temple-Inland manufactures containerboard and converts it into a complete line of corrugated packaging. More than 80% of the company's revenues come from its corrugated packaging division, with 7 containerboard mills and around 67 corrugated box plants. In 2009, the corrugated packaging division accounted for 84% of the $3 billion in total revenues. In 2006, Temple-Inland reported more than $4.1 billion in revenues; in 2007, reported more than $3.9 billion in revenues; and in 2008, reported more than $3.8 billion in revenues. Temple-Inland reported a net income of $26 million in the second quarter of 2009. Temple-Inland is currently traded on the New York Stock Exchange ("NYSE"). Temple Inland is the third largest producer of containerboard with 12% market share and 4.1 million tons of capacity. During the Class Period, Temple-Inland and/or its predecessors, wholly owned or controlled subsidiaries or affiliates sold Containerboard Products in interstate commerce directly to purchasers in the United States.

18. Smurfit-Stone Container Corporation ("Smurfit-Stone") is a Delaware corporation with its principal place of business in Chicago, Illinois. Smurfit-Stone is the second largest producer of containerboard with a 23% market share and capacity of 8 million tons. On or about January 26, 2009, Smurfit-Stone filed a voluntary Chapter 11 petition in the United States Bankruptcy Court for the District of Delaware; effective June 30, 2010, Smurfit-Stone was discharged from the United States Bankruptcy Court for the District of Delaware under a plan of reorganization. During the Class Period, Smurfit-Stone and/or its predecessors, wholly owned or controlled subsidiaries or affiliates sold Containerboard Products in interstate commerce directly to purchasers in the United States.

19.     "Defendant" or "Defendants" as used herein, includes, in addition to those named specifically above, all of the named Defendants' predecessors, including Containerboard Products manufacturers merged with or acquired by the named Defendants and each named Defendant's wholly owned or controlled subsidiaries or affiliates that sold Containerboard Products in interstate commerce directly to purchasers in the United States during the Class Period.

20.     Each of the Defendants named herein acted as the agent or joint-venturer of or for the other Defendants with respect to the acts, violations and common course of conduct alleged herein.

## CO-CONSPIRATORS

21.     On information and belief, various other companies and individuals, not named as Defendants in this Complaint, may have participated as co-conspirators and performed acts and made statements in furtherance of such conspiracy.

## INTERSTATE TRADE AND COMMERCE

22.     Defendants and their co-conspirators sell Containerboard Products in the United States.  During all or part of the Class Period, the conduct of Defendants and their co-conspirators has taken place in and/or substantially affected interstate trade and commerce of the United States.

23.     Containerboard Products are a multi-billion dollar industry.  During the Class Period, annual sales of Containerboard Products in the United States were tens of billions of dollars.

## CHARACTERISTICS OF THE CONTAINERBOARD PRODUCTS MARKET THAT FACILITATE COLLUSION

**Market Concentration**

24.     Containerboard is the principal raw material used to manufacture corrugated products, including packaging.  Containerboard is made up of corrugated medium and linerboard.  Defendants and their co-conspirators manufacture and sell linerboard, corrugated medium, containerboard and corrugated boxes, and other corrugated packaging.

25.     The Containerboard Products market is the most concentrated segment of the paper packaging market. Consolidation has been ongoing in the corrugated box and containerboard markets throughout the last 12 years. In 1998, the top five Containerboard Products producers controlled only 42% of the containerboard market in North America: International Paper had 6% of the market; Weyerhaeuser had 7% of the market; Stone Container (now Smurfit-Stone) had 13% of the market; Temple-Inland had 7% of the market; and Georgia Pacific had 9% of the market.

26.     By 2009, the market was concentrated significantly, with the top five containerboard producers controlling over 74% of the market: International Paper had 29% of the market; Smurfit-Stone, which is now owned in part by Jefferson Smurfit, had 19% of the market; Georgia Pacific had 10% of the market; Temple-Inland had 10% of the market; and PCA had 6% of the market.



**Barriers to Entry**

27.     There are significant barriers to entry in the market for Containerboard Products that have facilitated Defendants' collusion described herein. These include: (1) capital-intensive start-up costs; and (2) high transportation costs.

**Defendants Face Similar Costs**

28.     Defendants and their co-conspirators share relatively similar costs. The technology and process of containerboard manufacturing are well known and Defendants and their co-conspirators employ the same types of equipment and processes in the production process.

29.     Moreover, the fewer the number of firms in an industry, the more similar costs become for the remaining firms. Accordingly, the recent consolidation of the Containerboard Products industry has driven Defendants' costs to be even more in line.

**Start-up Costs Create Barriers to Entry**

30.     Start-up costs for the Containerboard Products industry are extremely high, with expensive equipment and large-scale factory space requirements. The high start-up costs make entry into the Containerboard Products market very difficult.

**Geographic Barriers to Entry**

31.     Because Containerboard Products are bulky and cumbersome to transport, long distance shipping is expensive. Consequently, there are geographic entry barriers to the Containerboard Products industry. One industry presentation stated that "[t]he effective sales area for corrugated boxes, for example, is only about 150 miles from the production plant."

**No Close Substitutes/Commodity Nature of
Containerboard Products**

32.     Containerboard Products do not have close substitutes in the market. The closest substitutes for corrugated containers are plastic containers, which comprise a very small portion of the container or packaging market. Containerboard and corrugated packaging are commodities

- 9 -

because containerboard and corrugated containers made by any one of the Defendants are interchangeable with those of any other Defendant. In fact, Defendant PCA acknowledged this fact in its 2007 Form 10-K filing, noting "[c]ontainerboard is generally considered a commodity-type product and can be purchased from numerous suppliers."

**The Use of Trade Associations**

33.     Defendants' membership and involvement in trade organizations has further facilitated the conspiracy. The FBA is a Containerboard Products trade organization. Its members include Defendants PCA, International Paper, Georgia Pacific, Temple-Inland and Smurfit-Stone. During the Class Period, Thomas A. Hassfurther, PCA's current Executive Vice President, served as FBA's Immediate Past Chairman, and its board of directors includes representatives from Temple-Inland, Georgia Pacific, International Paper, Weyerhaeuser and Smurfit-Stone.

34.     The FBA holds at least three meetings each year where executives and other representatives of Defendants and their co-conspirators have an opportunity to meet and talk with one another, including communicating about supply and prices. Further, the FBA holds dozens of networking events each year which give Defendants and their co-conspirators additional opportunities to communicate with one another. Additionally, the FBA publishes a set of antitrust guidelines that it distributes to its members. Notably absent from these guidelines are prohibitions on communicating or agreeing with other Containerboard Product manufacturers concerning output, supply or capacity decisions. The industry group meetings provide fertile ground for collusive conduct. For example, the program guide for the 2008 International Containerboard Conference had sessions detailing global containerboard supply and demand forecasts as well as panels on "competitive strategies" hosted by senior executives from Defendants International Paper and PCA.

35.     The AF&PA is a trade organization representing forest and building product industries as well as pulp, paper and paperboard manufacturers. Its members include PCA,

International Paper, Georgia Pacific, Weyerhaeuser, Temple-Inland and Smurfit-Stone. During the Class Period, its officers have included James Hannan, President and Chief Executive Officer ("CEO") of Georgia Pacific and John Faraci, Chairman and CEO of International Paper. Its board of directors has included Daniel S. Fulton, President and CEO of Weyerhaeuser, Patrick J. Moore, Chairman and CEO of Smurfit-Stone, Doyle R. Simons, Chairman and CEO of Temple-Inland and Paul T. Stecko, Chairman and CEO of PCA. The AF&PA holds several meetings a year where executives and other representatives of Defendants have an opportunity to meet and talk with one another, and communicate about supply and prices. As described below, AF&PA forums have included instructions on steps to conceal anticompetitive communications between firms.

36.     Defendants also meet every two years at the RISI International Containerboard Conference. RISI is an information provider to the global forest products industry and provides market news and information. RISI hosts conferences regarding containerboard every two years, bringing together companies in the containerboard industry. All Defendants attended both the 2006 and 2008 conferences. Several Defendants have announced their intention to attend the upcoming RISI conference in November 2010.

37.     The International Corrugated Case Association ("ICCA") is an international trade association that serves to "promote and protect the general welfare of the worldwide corrugated container industry" by, among other things, collecting and disseminating information about corrugated products, issues, services and resources around the world. Every year, ICCA members participate in a global summit. Defendants Georgia Pacific, Smurfit-Stone, International Paper and Temple-Inland are all members of the ICCA.

**DEFENDANTS' PRIOR ANTITRUST VIOLATIONS**

38.     For decades, the paper and pulp industry has consistently demonstrated cartelization and anticompetitive behavior. In particular, the linerboard, corrugated medium, containerboard and

Containerboard Products segments of the industry have a history of antitrust violations dating back to a consent decree entered on April 23, 1940 in the action entitled *United States v. Nat'l Container Ass'n*, No. 8-318 (S.D.N.Y.), and *United States v. Container Corp. of Am.*, 393 U.S. 333 (1969), in which the defendants (including certain predecessors of Defendants herein) were found to have violated Section 1 of the Sherman Act after being charged with conspiring to restrain price competition in the sale of corrugated containers.[1]

39.     Defendants and their co-conspirators have a prior history of anticompetitive horizontal agreements with one another.  Many of the same firms involved in the cartel alleged in this Complaint, including PCA, International Paper, Smurfit-Stone (then known as Stone Container Corporation) and Georgia Pacific, were also involved in a price-fixing cartel over corrugated containers and corrugated cardboard sheets from 1964 through 1975.  Those firms that did not settle went to trial and most settled before a verdict was rendered; the sole defendant remaining at the time of the verdict was found liable for participating in a price-fixing conspiracy over corrugated containers and corrugated sheets from 1964 through 1975.  *See In re Corrugated Container Antitrust Litig.*, 556 F. Supp. 1117, 1125 (S.D. Tex. 1982).

40.     In 1998, Stone Container Corporation (now known as Smurfit-Stone) entered into a consent agreement with the Federal Trade Commission ("FTC") in which it pledged to refrain from "entering into, attempting to enter into, adhering to, or maintaining any combination, conspiracy, agreement, understanding, plan or program with any manufacturer or seller of linerboard to fix, raise, establish, maintain or stabilize prices or price levels, or engage in any other pricing action with

---

[1]     *See United States v. Container Corp. of Am.*, 273 F. Supp. 18 (M.D.N.C. 1967) and *United States v. Container Corp. of Am.*, No. C 180 G63, 1970 WL 513 (M.D.N.C. May 19, 1970).

regard to sales of linerboard to third parties." *See In the Matter of Stone Container Corp.*, No. C-3806, Decision and Order (F.T.C. May 18, 1998).

41.     Smurfit-Stone, International Paper, Georgia Pacific, Weyerhaeuser, Temple-Inland and PCA were also involved in a containerboard price-fixing cartel from 1993 through 1995. *See In re Linerboard Antitrust Litigation*, 305 F.3d 145 (3d Cir. 2002). As part of the conspiracy, these firms increased the "downtime" of linerboard machines, reducing production and inventory. At the same time, they purchased substantial amounts of containerboard from one another, protecting market shares, causing an artificial shortage and an increase in the price of linerboard. At the peak of the cartel's efficacy in 1995, the price of linerboard peaked at $530/ton. While the class action claims were settled in 2003 when the defendants agreed to pay their customers over $200 million, lawsuits brought by plaintiffs opting out of the class proceeded.

42.     As a result of their exposure to prior antitrust lawsuits, Defendants have taken steps to conceal their anticompetitive communications with one another. For example, at the AF&PA's 128th Annual Paper Week held in New York City in April 2005, Defendants attended a seminar entitled *Are You Vulnerable to Lawsuits?* aimed at reducing vulnerability to antitrust litigation. Because Defendants have received training on how to avoid getting caught communicating with one another regarding price and output decisions, the amount of conspiratorial evidence that can be obtained from public sources and without access to internal records and testimony is limited. Nevertheless, the existence of an agreement is unambiguously evidenced through their coordinated conduct during the Class Period.

## DEFENDANTS' ANTICOMPETITIVE CONDUCT

43.     Defendants are horizontal competitors at the production and sale levels, and collectively conspired to fix prices and artificially manipulate the market for the production and sale

- 13 -

of Containerboard Products throughout the United States. Each of the Defendants is, or was during some or all of the Class Period, a top producer and seller of Containerboard Products.

44. Beginning in at least 2005 and continuing up to the present, Defendants and their co-conspirators combined and conspired to unreasonably restrain competition in interstate commerce in the production and sale of Containerboard Products in the United States, in violation of Section 1 of the Sherman Act, 15 U.S.C. §1.

45. Shortly before the Class Period, the Containerboard Products industry endured two failed price increases. Specifically, on May 31, 2003, Official Board Markets reported that a $35/ton price increase in both linerboard and medium failed, noting "[n]ot only is this attempt a failure, but discounting prevails." While prices steadily increased in 2004, by early 2005 they again began to recede, bottoming out in the spring of 2005. On May 31, 2005, Official Board Markets reported that International Paper announced a $50/ton price increase but due to International Paper's competitors not backing the price increase with a "firm stance," the end result was a failed increase. In June 2005, "it became apparent that industry-wide price hikes weren't sticking. Instead of rising about 10%, prices on the thick paper used to make corrugated containers slipped as inventories of boxes inched higher." These factors acted together as the catalyst for Defendants to coordinate their capacity restraints in order to reduce available supplies and thereby fix, raise, stabilize and maintain the prices of Containerboard Products.

46. The period of 2005 through 2010 witnessed an exceptional number of containerboard plant closings, capacity reductions and price increases that can only be explained by a concerted effort by Defendants and their co-conspirators. Between August 2005 and August 2010, Defendants increased the price of Containerboard Products by more than 50% despite economic downturn in the latter half of the Class Period. Each of the price increases was implemented by Defendants nearly simultaneously and was facilitated by reductions in supply and production capacity.

- 14 -

47.    In the face of increasing demand, these reductions make no economic sense absent conspiracy and collusion.  Idling mills and machines during periods of strong demand is costly and economically irrational.  Smurfit-Stone acknowledged this fact in its Form 10-K for the 2006 fiscal year, stating: "the industry is capital intensive, which leads to high fixed costs and has historically resulted in continued production as long as prices are sufficient to cover marginal costs."

48.    Demand for Containerboard Products is tied to overall consumer demand and spending.  In mid-2005 and continuing thereafter through 2007, consumer demand, including demand for Containerboard Products in the United States, was relatively stable.  Despite industry expectations that demand would increase, Defendants cut capacity and raised prices.  These actions were contrary to Defendants' unilateral economic interests because, given market conditions and expectations that demand was increasing, a competitor acting alone would seek to maintain – if not expand – its capacity in order to enhance volumes, revenues, profits and market share.  In 2008, despite plummeting consumer demand in the United States, Defendants continued to raise prices; in August 2008, Defendants and their co-conspirators raised prices of containerboard by 9%, notwithstanding fears of deflation in the general economy.  Defendants increased prices an unprecedented three times in 2010 to all-time highs, without any underlying cost justifications, leading the Association of Independent Corrugated Converters ("AICC") to note that the historic price increases "call[] into question the integrity of our industry" and "call[] into question the pricing activities of the major companies" and to note the similarity of the present conduct of Defendants to the conduct in the prior *Linerboard* cases.

49.    Defendants accomplished their conspiracy in substantial part through the coordinated reduction of capacity, and in turn, supply.  As a result of Defendants' conduct as alleged in this Complaint, their production capacity of Containerboard Products was significantly reduced, while their prices increased by approximately 50% between 2005 and 2010:

# Industry Containerboard Inventory & Pricing



Sources: Industry Inventory: Fiber Box Association and American Forest & Paper Association; Linerboard Prices: Industry Publications

**Specific Acts in Furtherance of the Conspiracy**

50. On May 9, 2005, Smurfit-Stone reported in its Form 10-Q filing that "[w]e expect our profitability to improve in the second quarter of 2005 as a result of stronger demand and higher sales prices for containerboard and corrugated containers."

51. Defendant Weyerhaeuser similarly reported strong demand for Containerboard Products during the first quarter of 2005:

> Containerboard sales increased $36 million. Unit shipments increased 45,000 tons, or approximately 18 percent, and price realizations, which include freight and are net of normal sales deductions, increased $71 per ton, or approximately 22 percent in the first quarter of 2005, compared to the same period of 2004. These increases were mainly due to an improvement in demand for corrugated packaging in U.S. markets.

52. Similarly, International Paper reported in its May 6, 2005 Form 10-Q that "[s]econd quarter earnings normally benefit from seasonally higher containerboard and box demand."

- 16 -

53.     Despite increased demand, Defendants reduced their production capacity for containerboard, resulting in increased prices.  In the first quarter of 2005, Smurfit-Stone closed its containerboard plant in Fernandina Beach, Florida, which had been producing 203,000 tons per year. Similarly, during the first quarter of 2005, PCA reduced its production capacity by 65,000 tons per year by taking off-line one of its three paper machines at its containerboard plant in Tomahawk, Wisconsin.

54.     Likewise, in the second quarter of 2005, International Paper reduced its capacity approximately 530,000 tons by idling production facilities.  This production reduction is twice what International Paper experienced the previous year ( 215,000-ton production downtime in the second quarter of 2004).  In its Form 10-Q filed on August 5, 2005, International Paper stated that the 2005 capacity reduction was "market related downtime" that was "taken to balance internal supply with our customer demand to help manage inventory levels."  However, as discussed above, when a manufacturing plant is idled during "downtime," the firm must continue to pay the fixed costs associated with the plant.  Thus, International Paper was able to drastically reduce its containerboard production and continue paying the fixed costs for Containerboard Products only because the conspiracy among Defendants enabled it to raise prices and charge supracompetitive prices.

55.     Temple-Inland took similar action in 2005.  Beginning in early 2005, and continuing throughout the remainder of the year, Temple-Inland closed containerboard converting facilities in Antioch, California, Newark, Delaware, Atlanta, Georgia, and Louisville, Kentucky.  This reduced the supply of corrugated containers and aided in the overall scheme to increase the price of Containerboard Products. Temple-Inland closed these facilities despite acknowledging in its May 10, 2005 Form 10-Q that "market demand strengthened, resulting in higher prices for most of our product offerings."  The closures were against Temple-Inland's unilateral economic self-interest because they were made during a period of increasing demand and prices.

- 17 -

56.     To facilitate their anticompetitive scheme, Defendants' representatives and those of their co-conspirators met June 26 through 29, 2005 at the PIMA Leadership Conference in Nashville, Tennessee. Pete Correll, Chairman and CEO of Georgia Pacific, David A. Spraley, Vice President of Georgia Pacific, C. Richard Larrick, General Manager of Georgia Pacific, Russell Bishop, Chief Information Officer of Weyerhaeuser, Dick Thomas, Vice President of Weyerhaeuser, Ronnie Cosper, Papermill Superintendent for Smurfit-Stone, and others were reported as attending the PIMA 2005 Leadership Conference in Nashville, Tennessee. The theme of this conference was *Success through Collaborative Teamwork*. Topics discussed included *Effective Collaboration through Teamwork* and *Price Execution in the Forest Products Industry*.

57.     During the 2005 PIMA conference, Deloitte Consulting LLP gave a presentation called *Pricing Opportunities in the Forest Products Industry*. Deloitte reminded meeting attendees that the industry was "rich in competitive intelligence, which facilitates strategic pricing analysis." The presentation also included a discussion regarding the several factors which made coordinated price increases possible such as "underestimating competitor's desire to raise prices" and "overestimating the threat of new entrants into the market."

58.     During the conference, on June 27, 2005, Smurfit-Stone reported that it "ha[d] no immediate plans to close down plants." However, only days after the conference, on June 30, 2005, Deutsche Bank, which monitors the containerboard industry and issues regular reports on developments within the industry, reported that "[t]here has been a lot of 'chatter' suggesting that one or more of the big integrated producers will soon shutter capacity."

59.     Indeed, again in the third quarter of 2005, Smurfit-Stone permanently closed two more of its containerboard mills in New Richmond, Quebec and Bathurst, New Brunswick as part of what the company called its "ongoing assessment and restructuring efforts." It closed these mills despite acknowledging in its August 8, 2005 Form 10-Q that "[i]n the third quarter of 2005, we

- 18 -

expect seasonably strong demand for containerboard and corrugated containers." All together, the closed mills accounted for approximately 274,000 tons per year of containerboard. According to its 2007 Annual Report, in 2005 Smurfit Stone shut down 8.5% of its total capacity.

60.     On August 4, 2005 Deutsche Bank reported:

> Smurfit-Stone today announced a number of permanent capacity closures . . . a bit more capacity than we had expected, . . . a bit earlier than we expected. . . . They amount to 480K tons, or . . . about 1.3% North American capacity. . . . With Smurfit having done a good deal of "heavy lifting," we'll be watching the behavior of other major competitors like International Paper and Weyerhaeuser . . . the outlook of demand has also improved remarkably in recent weeks.

61.     The following day, the *St. Louis Post-Dispatch* reported that Smurfit-Stone stated that "the closures are part of its restructuring efforts and will reduce its container-board manufacturing capacity by about 700,000 tons." However, the closures were against Smurfit-Stone's unilateral economic self-interest because they were made during a period of increasing demand and prices.

62.     Similarly, during the second quarter of 2005, Georgia Pacific reduced the number of its containerboard shipments "due to slowback and maintenance downtime." A slowback is another form of output restriction in lieu of completely shutting a machine or mill down. Georgia Pacific did both in 2005, scheduling all major maintenance downtime across its mills in the fourth quarter of 2005.

63.     In the third quarter of 2005, International Paper also announced the closing of its 100,000 ton-per-year mill in Fort Madison, Iowa.

64.     On October 17, 2005, Deutsche Bank reported that containerboard prices were moving up but that "[w]hether prices can rise further without more supply reductions remains an open question."

65.     After reducing production despite steady or increased demand, Defendants were able to create artificial shortages of Containerboard Products and thus raise prices to supracompetitive levels in 2005. Indeed, on September 7, 2005, Smurfit-Stone announced a price increase of $30/ton

- 19 -

to take effect on October 1, 2005. On September 17, 2005, PCA followed with the announcement of a $30/ton price increase also effective October 1, 2005. Similarly, Georgia Pacific announced price increases of $30/ton on linerboard medium, and 8% on boxes to be effective during the fourth quarter of 2005.

66.     Defendants profited substantially from these price increases. In a December 2005 presentation by International Paper's former Executive Vice President and Chief Financial Officer, Marianne Parrs, one slide titled *Strong Leverage to Improving Prices: Price Sensitivity of U.S. Businesses* noted that there would be a $0.15 earnings per share increase for every $50 per unit change in the price of containerboard.

67.     Defendants and their co-conspirators also anticipated strong demand for Containerboard Products in 2006. For example, in its Form 10-K for the year ending December 31, 2005, International Paper reported that: "We see favorable signs of positive momentum for the remainder of 2006. We anticipate that demand in North America for both uncoated paper and industrial packaging products will be stronger . . . ."

68.     Effective on or about January 1, 2006, Defendants and their co-conspirators again raised prices on linerboard by 8% ($40/ton) from $480/ton to $520/ton. At the same time, Defendants and their co-conspirators raised the price of corrugated medium by 9% ($40/ton) from $450/ton to $490/ton. These price increases, deemed "unusual" by Deutsche Bank just weeks before, occurred across-the-board and were imposed by all Defendants and their co-conspirators at or about the same time. In 2007, PCA Chairman and CEO, Paul Stecko, commented on the January 2006 price hike, noting that "since consolidation began, inventories have trended down and we did get a price increase last January. So that would historically not be a normal time."

69.     That same month, in January 2006, the Corrugated Packaging Alliance Action Team met at Georgia Pacific's headquarters in Atlanta, Georgia. Despite the record low containerboard

and corrugated container inventories and rising containerboard product prices, over the course of the following year, Defendants and their co-conspirators continued to reduce capacity of Containerboard Products.

70.     In the first quarter of 2006, Weyerhaeuser closed its 350,000 tons-per-year Plymouth, North Carolina containerboard plant.  This plant shutdown would not have been in Weyerhaeuser's economic self-interest if it was acting unilaterally, as it came at a time of rising prices and record low inventories.  In its 2006 first quarter Form 10-Q, Weyerhaeuser reported:

> The company anticipates improvement in earnings for the Containerboard, Packaging and Recycling segment in the second quarter primarily due to implementation of previously announced price increases for both containerboard and corrugated packaging and a seasonal increase in demand for corrugated packaging.

71.     As in 2005, Defendants continued to raise prices and reduce capacity in 2006.  On February 13, 2006, Deutsche Bank reported that containerboard "[p]rices are rising – even faster than expected.  Transaction prices on United States kraft linerboard and corrugating medium rose $40/mton in January – fully reflecting the price hike.  Spot prices have reportedly risen further."

72.     On February 21, 2006, Deutsche Bank reported that containerboard inventories "remain at historically lean levels" and characterized containerboard prices as "rising rapidly." Deutsche Bank also noted: "A $50/ton price hike has been announced for late March/early April.  A $40/ton January increase on linerboard & corrugated medium appears to have taken hold with relative ease. A $30/ton October hike also went in with ease."  On March 4, 2006, Official Board Markets noted:

> Other integrateds that have announced recently (all up $50 per ton) include Weyerhaeuser (April 1), Norampac (March 20), and Packaging Corp. of America (March 21).
>
> Last month, Georgia-Pacific announced a $50 per ton increase to go into effect March 11 while Smurfit-Stone Container Corp.'s $50 per ton increase is scheduled to take effect April 1.

If this latest increase is fully implemented it will mean that containerboard prices have risen 33 percent since mid-October.

73.     On March 6, 2006, International Paper filed its Form 10-K for the year ending December 31, 2005.  In its Executive Summary discussing the outlook for 2006, it noted that "operating rates should improve in 2006 reflecting announced industry capacity reductions in uncoated papers and containerboard."

74.     On March 14, 2006, the FBA's Executive Committee met.  Approximately three weeks later, in early April 2006, Defendants and their co-conspirators raised prices on linerboard again, this time by nearly 10% ($50/ton) from $520/ton to $570/ton.  At the same time, Defendants and their co-conspirators raised the price of corrugated medium by over 10% ($50/ton) from $490/ton to $540/ton.  These price increases occurred across-the-board and were imposed by all Defendants and their co-conspirators at or about the same time.

75.     In sum, between October 2005 and April 2006, Defendants and their co-conspirators raised prices in concert three times, in October 2005, January 2006 and April 2006.  By April 2006, the price of linerboard had reached prices of $560-$570/ton – its highest level since 1995.

76.     The price increases in containerboard and its components caused corrugated container prices to rise as well. As reported by Deutsche Bank: "It appears that most of the first two containerboard price hikes have made their way into box prices.  Producers are now trying to push this spring's $50/ton hike downstream to boxes.  There are encouraging early signs in the corrugated sheet & local box markets."  Defendants' costs, however, did not increase during this period.  In discussing the increasing profit margins enjoyed by the industry in the first quarter of 2006, Deutsche Bank noted "[h]igher prices and a moderation of cost pressures were the key drivers."  Thus, increased costs cannot explain the price increases.  Notably, in April 2006, containerboard prices reached their highest peak since 1995 – which was also during a period of known collusion.  *See Linerboard Antitrust Litig.*, 305 F.3d 145.

77.     In its May 9, 2006 Form 10-Q, International Paper reiterated its bullish outlook for demand, noting that "[e]ntering the second quarter, we expect operating profits to be somewhat higher than in the first quarter.  Product demand and projects sales volumes are solid across all of our key platform businesses."

78.     Strong demand throughout 2006, combined with the capacity cuts and output restrictions imposed by Defendants and their co-conspirators, resulted in significantly higher prices for Containerboard Products as stated in Weyerhaeuser's 2006 second quarter Form 10-Q: "The increasing price realizations for containerboard and corrugated packaging resulted from an increase in industry demand for corrugated packaging, coupled with high containerboard mill operating rates and low inventory levels."  Despite an increase in demand which began at least in 2005, in early 2006, Weyerhaeuser closed its 350,000 ton-per-year containerboard machine at its Plymouth, North Carolina mill.

79.     On June 8, 2006, Deutsche Bank reported on the effect of recent tightening of supply by Defendants:

> Most containerboard companies reported [quarter over quarter] margin gains in Q1 2006.  Higher prices and a moderation of cost pressures were the key drivers.
>
> *       *       *
>
> Published estimates for linerboard price have risen $120/ton since September, reaching $515/ton – the highest level since October 1995. . . .
>
> Supply discipline has been an essential part of the equation.  Since early 2005, 1.67MM tons of capacity have been closed.

80.     On June 15, 2006, Deutsche Bank confirmed that containerboard price increases resulted in higher corrugated container prices: "The strong box volume and lower inventories in May enhance the odds that producers will get full pass-through of the containerboard hike into boxes."

81.     On July 18, 2006, Deutsche Bank reported that "[PCA] says that April hike is now essentially fully into boxes."

- 23 -

82. On July 25, 2006, Deutsche Bank reported that Weyerhaeuser's "box prices were up 5.3%."

83. On August 7, 2006, Deutsche Bank reported that "[c]ompany earnings announcements to date show the 3rd price hike is being passed in the form of higher box prices." On October 9, 2006, Deutsche Bank reported that containerboard "[d]emand remains solid."

84. On October 18, 2006, Deutsche Bank reported that PCA had record earnings per share in the third quarter of 2006, which reflected the hikes in containerboard prices. PCA was contributing to the cartel by taking downtime and reducing containerboard output while demand remained strong. Under competitive market conditions, PCA's downtime would not have been in its unilateral interest; rather, it would have continued to free ride on the output reductions of the other Defendants. PCA's downtime under then-current market conditions and expectations made economic sense only pursuant to an agreement or understanding with its competitors that they would also restrict supply.

85. This was confirmed by PCA's Form 10-K for the year ending December 31, 2006:

> Industry supply and demand trends were favorable throughout 2006. Industry shipments of corrugated products increased 1.3% during 2006 compared to 2005, on a per workday basis. During this same period, industry containerboard inventory levels remained at historically low levels, with inventory at the end of December 2006 at its second lowest level in the past 25 years, on a weeks of supply basis. Since September 2005, linerboard prices have increased $120 per ton, or approximately 30%, as reported by industry publications.

86. Just one week after reporting that PCA was taking downtime to further reduce any slack in the supply constraint, on October 25, 2006, Deutsche Bank reported: "Best news may be SSCC's [Smurfit-Stone] Q4 'maintenance' downtime. With markets appearing to slow, throttling back on supply could help pricing environment." In October 2006, Weyerhaeuser and International Paper announced a price increase effective on January 1, 2007.

87.     The unprecedented across-the-board increases in containerboard prices were due to a concerted effort by Defendants and their co-conspirators to restrict output and capacity. Industry trade journals reported that the "linerboard market began to tighten in the fourth quarter of 2005 and containerboard dropped to an unusually low level of 2.2 million tons." Another trade journal noted that "capacity reductions . . . may be the most important overall factor behind the strong price gains" and that "[w]ith supplies short, mills were in the drivers' seat and began to aggressively push up prices."

88.     All together, between first quarter 2005 and third quarter 2006, Defendants and their co-conspirators shut down nearly 1.7 million tons worth of containerboard capacity. In comparison, the conspiracy among a similar set of defendants in 1993 through 1995 was executed by shutting down only 300,000 to 350,000 tons of capacity. *See Linerboard Antitrust Litig.*, 305 F.3d at 154. These massive shutdowns were part of Defendants' and their co-conspirators' concerted effort to stabilize and raise the price of Containerboard Products.

89.     In 2007, Defendants and their co-conspirators continued to shut down capacity in furtherance of their conspiracy. In late January 2007, International Paper took 74,000 tons of containerboard capacity offline. Similarly, in April 2007, PCA reported that it took unspecific downtime in the first and second quarters of 2007.

90.     On April 18, 2007, PCA Chairman and CEO, Paul Stecko, stated the following with respect to industry-wide inventories during the PCA's first quarter earnings conference call:

> Our containerboard inventories at the end of the first quarter were down about 2000 tons compared the year-end 2006 levels. I should also note that yesterday the Fibre Box Association released industry statistics for the month of March and in our opinion these statistics are very encouraging. Corrugated products demand was up 3.4% per workday and containerboard inventories fell by 75,000 tons to 2.472 million tons or 4.1 weeks of supply. This is 200,000 tons lower than the average March containerboard inventory for the past ten years and on a weeks of supply basis, this is the lowest March ending inventory on record. So pretty healthy statistics.

91.    In June 2007, Smurfit-Stone closed down two plants, a 148,000 tons-per-year plant in Vernon, California and a 52,000 tons-per-year plant in Carthage, Indiana.

92.    Defendants continued to meet at industry events to facilitate the conspiracy.  On June 18 through 20, 2007, there was a Joint AF&PA, AICC and FBA Washington Fly-In meeting in Washington, DC.  Shortly thereafter, Weyerhaeuser announced a $40/ton price hike, effective August 1, 2007.

93.    In early July 2007, PCA and Smurfit-Stone also announced a $40/ton containerboard price hike, also effective August 1, 2007.

94.    Regarding whether these announced price hikes would work, Deutsche Bank commented that "the global containerboard backdrop remains just about as favorable as any we have seen in over 20 years."  On July 6, 2007, Deutsche Bank reported that "[v]irtually all major containerboard producers have slated $40-50/ton hikes for August."

95.    On or about August 1, 2007, Defendants and their co-conspirators raised prices on containerboard again, this time by over 7% ($40/ton) from $570/ton to $610/ton.  At the same time, Defendants and their co-conspirators raised the price of corrugated medium by over 7% ($40/ton) from $540/ton to $580/ton.  These price increases occurred across-the-board and were imposed by all Defendants and their co-conspirators at or about the same time and were accomplished pursuant to their price-fixing conspiracy.

96.    On September 4, 2007, Deutsche Bank reported that the "full $40/ton price hike initiative for August was reflected in the trade papers and most of our trade reports suggest uncharacteristic discipline from the big integrateds."

97.    To facilitate the price hikes, Defendants continued to restrict capacity.  Indeed, on October 2007, International Paper closed down its 200,000 tons-per-year containerboard plant in Terra Haute, Indiana.

98.     On February 1, 2008, Deutsche Bank reported that "plant inventories fell from 3.1 to 3.0, one of the lowest levels in history."

99.     In an effort to further consolidate the market, on March 17, 2008, International Paper announced plans to purchase Weyerhaeuser's containerboard, packaging and recycling business for $6 billion in cash.  The purchase was finalized on August 4, 2008, giving International Paper a 29% share of the containerboard market.  The purchase included 9 containerboard mills and 72 packaging factories and made International Paper the single largest containerboard producer with 11.5 million tons per year of global containerboard capacity.  As a result of the merger, the top seven containerboard producers made up a combined market share of approximately 80%.

100.    On March 24 through 26, 2008, the FBA's Annual Meeting 2008 was held at the J.W. Marriot Desert Springs in Palm Desert, California.  At this Annual Meeting, the FBA's board of directors meeting was also held.

101.    On March 30 through April 2, 2008, the AF&PA held its Annual Paper Week convention in New York, New York.

102.    On May 16, 2008, Deutsche Bank reported that containerboard inventory was the "second-lowest April level in the last 20 years."

103.    On May 28, 2008, Deutsche Bank reported that both Smurfit-Stone and Georgia Pacific recently announced a $50/ton price hike, effective July 1, 2008.

104.    On or about July 1, 2008, despite the effects of an economic recession felt throughout the United States, Defendants and their co-conspirators raised prices on linerboard yet again, this time by over 9% ($55/ton) from $610/ton to $665/ton.  At the same time, Defendants and their co-conspirators raised the price of corrugated medium by over 9% ($40/ton) from $580/ton to $620/ton.  Defendants quickly followed the price increases in containerboard and corrugated medium by announcing an 11% increase in the price of finished boxes. These price increases occurred across-

the-board and were imposed by all Defendants and their co-conspirators at or about the same time and were accomplished pursuant to their price-fixing conspiracy.

105.    To support the price increases, Defendants continued to restrict capacity and containerboard inventories. At the end of July 2008, producer inventories of containerboard were at their lowest level in tons since 1980. On September 9, 2008, International Paper announced that it would be shutting down its number three paper machine in Oklahoma which produced approximately 430,000 tons annually of containerboard. And again on October 1, 2008, International Paper announced that it would be shutting down its number two paper machine at the Albany Mill in Oregon which produced approximately 250,000 tons annually of containerboard. To justify this closure, International Paper stated that it was "a necessary near-term decision made in light of continuing high input costs, current economic conditions and our commitment to match our production to our customers' needs."

106.    Similarly, in October 2008, Smurfit-Stone closed its 135,000 tons-per-year corrugated medium plant, in Snowflake, Arizona. That same month, International Paper began idling its 250,000 tons-per-year containerboard plant in Albany, Oregon. Less than a month later, in November 2008, International Paper closed its 430,000 tons-per-year linerboard plant in Valiant, Oklahoma.

107.    Yet the pricing of linerboard consistently increased. As Temple-Inland recognized, the "[i]mproved industry fundamentals has led to higher average prices and reduced volatility" in linerboard:



**Improved Linerboard Pricing**

Source: RISI

Linerboard ($/ton)

Improved industry fundamentals has led to higher average prices and reduced volatility

108.     After the October 2005 price hike, prices for containerboard rose 12%. In all, "[f]rom the summer of 2005 to the summer of 2008, [containerboard] prices jumped more than 50 percent as the industry consolidated and cut capacity, reducing supplies and pushing prices higher."

109.     Between the fourth quarter of 2008 and the first quarter of 2009, over 800,000 tons per year of capacity was idled by Defendants Smurfit-Stone and Georgia Pacific. In the fourth quarter of 2008, Smurfit-Stone idled plants in Matane, Quebec (174,000 tpy), Missoula, Montana (171,000 tpy), and Jacksonville, Florida (170,000 tpy). Likewise, Georgia Pacific idled plants in Cedar Springs, Georgia (265,000 tpy) and Palatka, Florida (40,000 tpy).

110.     In 2009, John Geenan, a senior vice-president of the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union ("USW"), explained that the containerboard industry aggressively managed capacity in order to maintain or increase pricing and that whenever prices threaten to decrease the industry rapidly removed capacity. However, in an effort to conceal their anticompetitive conduct, Defendants referred to this as "[c]apacity [m]anagement" or "capacity rationalization." Indeed, as Temple-Inland stated in a February 2009 investor presentation, the "[i]ndustry [f]undamentals" of the North

American Containerboard market are the "[c]onsolidating industry," "[s]ignificant capacity rationalization and downtime," and "[i]mproved pricing."

111.    On December 14, 2009, Smurfit-Stone announced the permanent closure of its Containerboard Products mills in Missoula, Montana (which produced 620,000 tons of linerboard annually) and Ontonagon, Michigan (which produced 280,000 tons of medium annually) effective December 31, 2009.  In response to the Missoula mill closure, Montana state senator Cliff Larsen sent a letter to Judge Brendan L. Shannon, presiding Judge in Smurfit-Stone's Chapter 11 Bankruptcy proceedings, stating:

> We are told that Smurfit-Stone does not want the plant to run because they want to control "the market."  Well, what about competition?  What about gathering in cash for investors and creditors?  With electric generating capacity of about seventeen megawatts setting idle, trained plant workers willing to work and generate that biomass energy source we have a ready source of green energy sadly not generated.  Another income source – not actualized.

112.    Similarly, in mid December 2009, International Paper completely closed its containerboard mills in Albany, Oregon – a mill acquired from Weyerhaeuser in 2008 – and Pineville, Louisiana.  This resulted in a 12% reduction in International Paper's containerboard capacity.  International Paper stated that there was too much production capacity in the containerboard market and closed this mill to balance the output.  International Paper's Vice President of containerboard manufacturing, Tim Kelly, stated: "There was such a dramatic change in demand.  It was huge. . . .  We are looking at having 11 million tons of capacity going into 2009, and we were only on pace to sell about 9 million tons."

113.    However, as discussed below, these justifications were pretextual as International Paper and the other Defendants increased prices three times in 2010 because of insufficient capacity and increased demand.

- 30 -

114.    Indeed, in November 2009, Goldman Sachs recognized that International Paper would benefit from the expected 2010 price hike in Containerboard Products because of capacity reduction in the industry, robust expert markets and low inventory levels.

115.    Despite Defendants' pretextual justifications for the 2009 mill closures, the reductions in output of Containerboard Products in 2009 allowed Defendants to raise prices to historical levels in 2010.

116.    Effective on or about January 1, 2010, Defendants and their co-conspirators again raised prices on linerboard by over 8% ($50/ton) from $585/ton to $635/ton.  At the same time, Defendants and their co-conspirators raised the price of corrugated medium by over 8% ($50/ton) from $555/ton to $605/ton. This price increase occurred across-the-board and was imposed by all Defendants and their co-conspirators at or about the same time.  Just three months later, effective on or about April 1, 2010, Defendants and their co-conspirators again raised prices on linerboard by over 9% ($60/ton) from $635/ton to $695/ton.   At the same time, Defendants and their co-conspirators raised the price of corrugated medium by over 9% ($60/ton) from $605/ton to $665/ton. This price increase occurred across-the-board and was imposed by all Defendants and their co-conspirators at or about the same time.

117.    Yet again in early July, Defendants raised prices for a third time in 2010.  Georgia Pacific was the first to inform customers of the $60/ton increase that would take effect on August 1. As an industry analyst noted, "[w]ith the global containerboard market very tight, it would be surprising if International Paper and Smurfit-Stone don't make similar moves."   Indeed, announcements were made later in the week by International Paper, Temple-Inland, RockTenn, and KapStone Paper and Packaging.  Earlier in June, Longview Fibre Paper and Packaging announced a $60/ton increase for its mainly West Coast customers.  These six producers make up 54% of North American linerboard and medium capacity.

118.     The third price increase, on top of the $60/ton increase in April 2010 and the $50/ton increase in January 2010, resulted in a $170/ton price increase for 2010 and record prices for Containerboard Products.   Defendants were able to sustain the price increases by reducing production levels in the face of increased demand, which was up 5.3% in May 2010.  Containerboard inventories remained at a 35-year low – all because of Defendants' intentionally reduced capacity, as discussed above.  As one analyst stated, mills are basically "sold out" and having a difficult time keeping up with domestic and export demand.

119.     On July 14, 2010, the AAIC published an article entitled *3rd Containerboard Increase puts the Integrity of Our Industry on the Line*.  In light of the significant manufacturing capacity cuts, as well as the absence of cost drivers, the article acknowledged that a third price increase in 2010 in that environment "calls into question the integrity of our industry."  The article goes on to forewarn of serious repercussions:

> This third increase is rightfully calling into question the pricing activities of the major companies. During the years 1994-1995, six price increases in the span of 18 months pushed containerboard to a then-unheard-of peak of $525-535/ton. These actions rightfully caused corrugated users to seek alternative packaging and reduce their corrugated purchases – witness the growth of returnable plastic container use in the mid-1990s. A far more serious result was an inventory collusion allegation and subsequent class action lawsuit brought by the corrugated industry's customer base that cost containerboard makers over $210 million in settlements.

120.     Defendants and their co-conspirators raised the price of containerboard in order to cause an increase in the price of corrugated containers.  Because Defendants convert 81% of the containerboard they manufacture into corrugated containers, Defendants reduced containerboard capacity and jointly increased containerboard prices in order to artificially drive up the price of corrugated containers and increase their profits.

121.     To accomplish the unprecedented price increases during the Class Period, Defendants and their co-conspirators needed to reduce capacity in a concerted fashion.  No single Defendant could reduce capacity enough to cause an industry-wide price increase.  Accordingly, Defendants

reduced capacity in concert to prevent any one Defendant from bearing the brunt of the capacity shutdown. Defendants' coordinated efforts to restrict containerboard supply substantially reduced the inventory available for sale to Plaintiff and the members of the Class.

122.    Further, the price of both linerboard and corrugated medium rose at exactly the same time by exactly the same per-ton amounts. This identical and simultaneous across-the-board price increase on multiple products can only be explained by concerted and coordinated behavior by Defendants.

**THERE ARE NO LEGAL EXPLANATIONS FOR THE
COORDINATED PRICE INCREASES**

123.    Despite the unprecedented price increases implemented in the Containerboard Products industry during the Class Period, there were no sustained significant changes in production costs which could account for those price increases or Defendants' coordinated reduction in manufacturing capacity and product supply. During the Class Period, prices increased at over double the rate of corresponding manufacturing costs.

124.    There are four main costs which are responsible for the bulk of the total cost to manufacture and produce Containerboard Products: (1) raw material costs; (2) labor costs; (3) energy costs; and (4) environmental compliance costs. As explained below, there were no significant or sustained changes in any of these types of costs during the Class Period.

125.    <u>Raw Material Costs</u>: Pulpwood (woodchips used to produce various paper products) is the main input for linerboard. Consequently, it is by far the most significant portion of linerboard cost, representing approximately 40% to 50%. Alternately, other factors including energy and labor cumulatively represent only about 25%. Because pulpwood prices represent such a large portion of linerboard cost, significant changes in the former may be detected in changes in the latter. The price of pulpwood has increased at a constant rate since the middle of 2001 (an average of roughly 6% per

year). As a result, there are no major fluctuations in pulpwood price that correspond to the fluctuations in Containerboard Products.

126.     <u>Labor Costs</u>: According to PCA's executives: "Labor costs in a well run containerboard mill run $30-$40/ton cash cost, which is a relatively small part of the overall manufacturing cost." Average weekly earnings for production workers at paperboard mills have remained flat during the Class Period. Additionally, the 2005 annual report for Smurfit-Stone stated that both post-retirement healthcare and life insurance benefits were reduced in 2005. Therefore, labor costs can largely be dismissed as an explanation for Containerboard Products price increases.

127.     <u>Energy Costs</u>: Studies by economists have found no significant effect of energy costs on containerboard prices. Additionally, International Paper, the largest producer of containerboard, stated in its 2005 Form 10-K that, "[w]hile energy, wood and raw material price movements are mixed, their impact for the quarter is expected to be flat." In reference to the first few months of 2006, it was further added, "[w]e are starting to see some reductions in natural gas and southern wood costs that, if the trend continues, should benefit operations as the year progresses." Despite some volatility in the natural gas market since that time, natural gas prices in 2010 are at or below the natural gas prices existing at the beginning of the Class Period.

128.     Despite the absence of any lasting cost increases, Defendants have nevertheless attempted to blame increasing costs as the reason for their capacity restrictions and increases in Containerboard Products prices. Specifically, in the third quarter of 2006, the President and CEO of Norampac attempted to explain the closure of Norampac's 300,000 tons-per-year Ontario mill as follows: "This decision was taken to mitigate the negative impacts of several economic factors such as growing fiber supply costs, rising energy costs and the strengthening of the Canadian dollar." However, as this explanation does not comport with the relevant market data, it serves as little more than a pretense for collusive activity. *See In re Linerboard Antitrust Litig.*, 504 F. Supp. 2d 38, 53

- 34 -

(E.D. Pa. 2007) ("The Third Circuit has long recognized that evidence of pretextual explanations for price increases or output restrictions, 'if believed by a jury, would disprove the likelihood of independent action' by an alleged conspirator.") (citation omitted).

129.    In response to Norampac's announcement, Deutsche Bank reported that "[w]e are somewhat surprised by this announcement.  Linerboard prices are up $120/ton over the last year, and the YTD operating rate for linerboard in the US is 98.9%."

130.    There is no consistent observable relationship between the price of natural gas (the predominant source of energy for the containerboard industry) and the price of containerboard.  For example, although there was a brief uptick in the price of natural gas in the fourth quarter of 2005, the increased containerboard price during the same period outpaced any corresponding manufacturing cost increase.  Moreover, the price of natural gas fell nearly 40% from December 2005 to April 2006 without any corresponding price decrease in Containerboard Products.  In fact, in April 2006, well after the 40% drop in natural gas prices, Defendants and their co-conspirators again raised the price of containerboard over 10%.  If energy costs were responsible for price changes (as explained by Defendants to their customers), a 40% decrease in energy costs should result in a lower containerboard price, not a 10% increase.  Similarly, from April 2006 through June 2007, the price of natural gas declined by approximately 7%.  However, in August 2007, Defendants and their co-conspirators raised containerboard prices by 7%.  These increases in containerboard price cannot be explained by changes in energy costs.

131.    Deutsche Bank reported that PCA reduced its natural gas usage "to barely over 3% of purchased fuels (was 9% year ago)."  On April 18, 2006, Deutsche Bank doubted the ability of Defendants and their co-conspirators to push further price increases through, noting that "raw material costs for inputs like natural gas & wastepaper have fallen."  This is further indication that

neither natural gas costs nor raw material costs had a significant impact on costs associated with producing Containerboard Products.

132.  Environmental Compliance Costs:  Defendants' public filings report that "[c]ompliance with environmental standards should not adversely effect our competitive position or operating results."  Accordingly, compliance with environmental regulations cannot explain the extraordinary increase in price of containerboard during the Class Period.

133.  The elimination of cost explanations supports an inference of conspiracy.  Both the capacity reductions and the price increases during the period beginning in the summer of 2005 were recordbreaking in magnitude.  In regards to capacity reductions during this period, another trade journal called them "unprecedented."  By the end of 2006, Defendants had successfully driven inventory to their lowest levels in 25 years.  In addition, demand for Containerboard Products is tied to overall consumer demand and spending.  In 2008, general consumer demand in the United States plummeted.   Yet, in August 2008, Defendants and their co-conspirators raised prices of containerboard by 9%.  As one commentator noted, "[from] the summer of 2005 to the summer of 2008, [containerboard] prices jumped more than 50 percent as the industry consolidated and cut capacity, reducing supplies and pushing prices."  Even though the United States economy has continued to be weak with fears of deflation being expressed by economists and policymakers in 2009 through 2010, during 2010 Defendants and their co-conspirators raised Containerboard Product prices an unprecedented three times in one year to all time highs.  Defendants accomplished their conspiracy in substantial part through the coordinated reduction of capacity, and in turn, supply.  The unprecedented reduction in North American containerboard supply was not the result of the closure of one producer's machines, but rather concerted effort by Defendants and their co-conspirators to reduce capacity in an effort to raise and stabilize prices of Containerboard Products to supracompetitive levels.

## ANTICOMPETITIVE EFFECTS OF DEFENDANTS' UNLAWFUL
## CONDUCT ON PLAINTIFF AND THE CLASS

134.     The conduct of Defendants described in this Complaint has inflicted antitrust injury upon Plaintiff and the Class, and unless restrained, will continue to produce the following anticompetitive effects, among others:

(a)     competition in the production and sale of Containerboard Products in the United States has been and continues to be substantially and unreasonably restricted, lessened, foreclosed and eliminated;

(b)     barriers to entry in the production and sale of Containerboard Products in the United States have been raised;

(c)     prices for customers seeking Containerboard Products in the United States have risen and will continue to do so;

(d)     customers seeking Containerboard Products in the United States are, and will be, deprived of choice with respect to price and manufacturer; and

(e)     the production and sale of Containerboard Products in the United States will continue to be artificially restrained.

## EQUITABLE TOLLING AND FRAUDULENT CONCEALMENT
## IN FURTHERANCE OF THE CONSPIRACY

135.     Throughout the Class Period, Defendants and their co-conspirators affirmatively and fraudulently concealed their unlawful conduct.

136.     Neither Defendants nor their co-conspirators informed Plaintiff or other Class members that they were fixing prices.  Accordingly, Plaintiff and Class members could not have discovered the violations herein earlier because Defendants and their co-conspirators conducted their conspiracy secretly, concealed the nature of their unlawful conduct and acts in furtherance thereof,

and fraudulently concealed their activities through various other means and methods designed to avoid detection.

137.    Defendants and their co-conspirators engaged in a successful price-fixing conspiracy, which they affirmatively concealed by, *inter alia*: (a) meeting secretly to discuss prices and markets of Containerboard Products sold in the United States and elsewhere; (b) using methods of communication in furtherance of the alleged conspiracy that were designed to avoid detection; (c) giving pretextual reasons for price increases on Containerboard Products; and (d) agreeing among themselves at meetings not to discuss publicly, or otherwise reveal, the nature and substance of the acts and communications in furtherance of their illegal scheme.  In the third quarter of 2006, the President and CEO of Norampac attempted to explain the closure of Norampac's 300,000 tons-per-year Ontario mill as follows: "This decision was taken to mitigate the negative impacts of several economic factors such as growing fiber supply costs, rising energy costs and the strengthening of the Canadian dollar."

138.    As a result of Defendants' and their co-conspirators' fraudulent concealment the statute of limitations has been tolled.  Plaintiff could not have discovered the existence of the combination and conspiracy alleged herein by the exercise of reasonable due diligence because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to avoid detection and affirmatively conceal such violations.

139.    Because the contract, combination or conspiracy was kept secret by Defendants, Plaintiff was unaware of the fact that prices for Containerboard Products were secretly raised, fixed, and maintained or stabilized as alleged herein.

140.    As a result of the fraudulent concealment of the conspiracy, Plaintiff asserts the tolling of the applicable statute of limitations affecting the causes of action by Plaintiff and the members of the Class.

## CLASS ACTION ALLEGATIONS

141.     Plaintiff brings this action on behalf of itself and as a class action under the provisions of Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following Class:

> All persons and entities who purchased Containerboard Products in the United States, and its territories and possessions, directly from any of the Defendants or their subsidiaries or affiliates at least as early as May 1, 2005, until the present. Excluded from the Class are any judicial officers who are assigned to hear any aspect of this action, government entities, Defendants, co-conspirators, and the present and former parents, predecessors, subsidiaries and affiliates of the foregoing.

142.     Plaintiff believes that there are at least hundreds of Class members, as above described, the exact number and their identities being known by Defendants, making the Class so numerous and geographically dispersed that joinder of all members is impracticable.

143.     Defendants' anticompetitive conduct has imposed a common antitrust injury on members of the Class.

144.     Defendants' anticompetitive conduct has uniformly affected Plaintiff and members of the Class.  Common questions of law and fact will predominate over individual questions of law and fact.  Among questions of law and fact common to the Class are the following:

(a)     whether Defendants and their co-conspirators engaged in an agreement, combination, or conspiracy to fix, raise, elevate, maintain, or stabilize prices of Containerboard Products and/or engaged in market allocation for those products sold in the United States;

(b)     the identity of the participants of the conspiracy;

(c)     the duration of the conspiracy alleged herein and the nature and character of the acts performed by Defendants and their co-conspirators in furtherance of the conspiracy;

(d)     whether the alleged conspiracy violated Section 1 of the Sherman Act, 15 U.S.C. §1;

- 39 -

(e)     whether the conduct of Defendants and their co-conspirators, as alleged herein, caused injury to the business or property of Plaintiff and the other members of the Class;

(f)     the effect of Defendants' conspiracy on the prices of Containerboard Products sold in the United States during the Class Period;

(g)     whether, and to what extent, Defendants and their co-conspirators fraudulently concealed their illegal combination, contract, conspiracy and other antitrust violations; and

(h)     the appropriate measure of damages sustained by Plaintiff and other members of the Class.

145.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Class treatment will permit a large number of similarly situated persons and entities to adjudicate their common claims in a single forum simultaneously, efficiently, and without duplication of effort and expense that numerous individual actions would engender. Prosecution of separate actions by individual plaintiffs would create a risk of inconsistent or varying adjudication. The proposed Class presents no difficulties of management that would preclude its maintenance as a class action. No superior alternative exists for the fair and efficient adjudication of this controversy.

146.    Plaintiff is a direct purchaser of Containerboard Products and its interests are coincident with and not antagonistic to those of the other members of the Class. Plaintiff is a member of the Class, has claims that are typical of the claims of the Class members, and will fairly and adequately protect the interests of the members of the Class. In addition, Plaintiff is represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

147.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications.

148.     Defendants have acted, and refused to act, on grounds generally applicable to the Class, which makes final injunctive relief with respect to the Class as a whole appropriate.

**COUNT**

**For Violation of §1 of the Sherman Act, 15 U.S.C. §1**

149.     Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

150.     Beginning at a time presently unknown to Plaintiff, and continuing through the present, the exact dates being unknown to Plaintiff, Defendants and their co-conspirators, by and through their directors, officers, employees, agents or other representatives, entered into a continuing agreement, understanding, and conspiracy in restraint of trade to artificially raise, fix, maintain, and/or stabilize prices for Containerboard Products in the United States, and its territories and possessions, in violation of Section 1 of the Sherman Act, 15 U.S.C. §1.

151.     The contract, combination, or conspiracy consisted of a continuing agreement, understanding and concerted action between and among Defendants and their co-conspirators, the substantial terms of which were to fix, raise and maintain, or stabilize prices for Containerboard Products in the United States through concerted and repeated reductions in production capacity. Such contract, combination or conspiracy constitutes a per se violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade.

152.     Defendants' contract, combination, agreement, understanding, or concerted action occurred in and affected interstate commerce.

153.     The contract, combination or conspiracy has had the following effects, among others:

         (a)     prices charged to Plaintiff and Class members for Containerboard Products were fixed or stabilized at higher, artificially derived, supracompetitive levels;

(b)     Plaintiff and Class members have been deprived of the benefits of free, open and unrestricted competition in the market for Containerboard Products; and

(c)     competition in establishing the prices paid for Containerboard Products has been unlawfully restrained, suppressed and eliminated.

154.    The conspiracy had its intended effect, as Defendants benefited from their collusively set price increases, as described herein.

155.    Defendants' unlawful conduct resulted in artificially high prices charged by Defendants and their co-conspirators to Plaintiff and the members of the Class for Containerboard Products.

156.    Plaintiff and members of the Class had to pay more for Containerboard Products than they would have paid in a competitive market.

157.    Plaintiff seeks to recover these overcharge damages.

158.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and Class members have suffered injury and financial damage in their respective businesses and property, in that they have paid supracompetitive prices for Containerboard Products.  Plaintiff and Class members will continue to be injured in their business and property by paying more for Containerboard Products purchased directly from Defendants and their co-conspirators than they would pay in the absence of the contract, combination or conspiracy.  Plaintiff's injuries are the type the antitrust laws were designed to prevent and flow from that which makes Defendants' conduct unlawful.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, Individually and on behalf of all members of the Class, prays for a judgment as follows:

A.      That the Court determines that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure;

B.      That the contract, combination or conspiracy, and the acts done in furtherance thereof by Defendants and their co-conspirators, be adjudged to have been a violation of Section 1 of the Sherman Act, 15 U.S.C. §1;

C.      That judgment be entered for Plaintiff and members of the Class against Defendants for three times the amount of damages sustained by Plaintiff and the members of the Class as allowed by law, together with the costs of this action, including reasonable attorneys' fees, pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§15 and 26;

D.      That Plaintiff and the Class be awarded pre-judgment and post-judgment interest at the highest legal rate from and after the date of service of this Complaint to the extent provided by law;

E.      That Defendants and their co-conspirators be enjoined from further violations of the antitrust laws; and

F.      That Plaintiff and members of the Class have such other relief, as the case may require, and the Court may deem just and proper under the circumstances.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury on all issues so triable.

DATED:  October 21, 2010                    Plaintiff,


By: Marvin A. Miller
Marvin A. Miller
Matthew E. VanTine
Lori A. Fanning
MILLER LAW LLC
115 S. LaSalle Street, Suite 2910
Chicago, IL  60603
Telephone:  312/332-3400
312/676-2676 (fax)
mmiller@millerlawllc.com

Bonny E. Sweeney
Alexandra S. Bernay
Paula M. Roach
ROBBINS GELLER RUDMAN
   & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

Samuel H. Rudman
ROBBINS GELLER RUDMAN
   & DOWD LLP
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)

Jonathan P. Whitcomb
DISERIO MARTIN O'CONNOR
   & CASTIGLIONI LLP
One Atlantic Street
Stamford, CT  06901
Telephone:  203/358-0800
203/348-2321 (fax)

Attorneys for Plaintiff